FILED

2013 FEB 11  PM 12: 35

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:

1
**REESE RICHMAN LLP**
Michael R. Reese (State Bar No. 206773)
2
875 Avenue of the Americas, 18th Floor
New York, New York 10001
3
Telephone:  (212) 643-0500
Facsimile:  (212) 253-4272
4
Email:     mreese@reeserichman.com
5

6

7
**CENTER FOR SCIENCE IN THE PUBLIC INTEREST**
Stephen Gardner
8
Amanda Howell
5646 Milton Street, Suite 211
9
Dallas, Texas 75206
10
Telephone:  (214) 827-2774
Facsimile:  (214) 827-2787
11
Email:     SGardner@cspinet.org
12
           AHowell@cspinet.org

13
*Attorneys for Plaintiff and the Proposed Class*

14

15
**UNITED STATES DISTRICT COURT**
16
**CENTRAL DISTRICT OF CALIFORNIA**
17

18

| | | |
|---|---|---|
| 19  DAVID GREEN, on behalf of himself and<br>20  all others similarly situated,<br><br>21                     Plaintiff,<br><br>22       v.<br>23  DR PEPPER/SEVEN UP, INC. and<br>24  DR PEPPER SNAPPLE GROUP, INC.,<br>25                     Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Case No. 2:12-cv-9567 FMO (Ex)<br><br>**FIRST AMENDED CLASS<br>ACTION COMPLAINT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

26

27

28

Plaintiff David Green ("Plaintiff"), by and through his undersigned counsel, alleges the following based upon his own personal knowledge and the investigation of his counsel.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a proposed class action against Dr Pepper Seven Up, Inc. ("DPSU") and Dr Pepper Snapple Group, Inc. ("DPSG") (collectively "Defendants") for misleading consumers about the nutritional qualities, health qualities, and ingredients of their soft drinks, namely, Cherry 7UP Antioxidant, Diet Cherry 7UP Antioxidant, Mixed Berry 7UP Antioxidant, Diet Mixed Berry 7UP Antioxidant, Pomegranate 7UP Antioxidant, and Diet Pomegranate 7UP Antioxidant, as well as other soft drink products sold under the "7UP" brand name that Defendants marketed as including antioxidants (the "Product" or "Products").

2.      This action is brought under California consumer protection laws: California Civil Code § 1750 *et seq.*; California Business and Professions Code § 17200 *et seq.*; and California Business and Professions Code § 17500.  Plaintiff makes no claims under common law or statutory fraud, including "fraud" as it is used in Federal Rule of Civil Procedure 9(b).

3.      During the period February 2, 2009, to the present (the "Class Period"), Defendants engaged in a widespread marketing and advertising campaign to mislead consumers about the nutritional qualities, health qualities, and ingredients of the Products.  Specifically, Defendants conveyed the message that the Products were healthful, natural, and antioxidant-rich beverages that derived their antioxidant content from real cherries, berries, or pomegranates.

4.      The following are examples of the labels that would have been viewed by consumers:





5.     Indeed, the names of the Products themselves: "**Cherry** 7UP Antioxidant," "**Mixed Berry** 7UP Antioxidant," and "**Pomegranate** 7UP Antioxidant" are misleading and deceptive as Defendants misleadingly convey to consumers that the Products contain cherries, mixed berries, or pomegranates. However, this in fact is not true, as the Products do not contain any cherries, mixed berries, or pomegranates whatsoever.

6.     Cherries, berries, and pomegranates are well known sources of antioxidants.  *See e.g.*, Virginia Ellen Uhley et al., *Pharmacokinetic Study of the Absorption and Metabolism of Montmorency Tart Cherry Anthocyanins in Human Subjects***,** Experimental Biology 2009, 565.4; E. Mitchell et al., *Cherry-Enriched Diets Reduce Metabolic Syndrome and Oxidative Stress in Lean Dahl-SS Rats***,** Experimental Biology 2007, 225.8 (*presented in minisymposium 225, Dietary*

FIRST AMENDED CLASS ACTION COMPLAINT

1    *Bioactive Compounds: Chronic Disease Risk Reduction*); Mara I. Gil et al.,

2    *Antioxidant Activity of Pomegranate Juice and its Relationship with Phenolic*

3    *Composition and Processing*, 48(10) J. Agric. Food Chem. 4581 (Oct. 2000).

4         7.    By the use of the word "ANTIOXIDANT" in prominent letter on the

5    packaging, Defendants misleading convey to consumers that the Products contains

6    cherries, berries, or pomegranates because, as stated before, those fruits are commonly

7    known to contain antioxidants.

8         8.    Additionally, by use of the words "**Cherry**," "**Mixed Berry**," and

9    "**Pomegranate**" in the very names of the Products themselves, Defendants

10   misleadingly and deceptively convey to consumers that the Products contain cherries,

11   berries, or pomegranates and that these cherries, berries, and pomegranates are the

12   source of the antioxidants themselves.  However, this is not true, as the Products do

13   not contain any cherries, berries, or pomegranates whatsoever.

14        9.    Defendants conveyed their misleading message through a widespread

15   marketing and advertising campaign on the packaging of the Products and on various

16   websites, including Defendant DPSU's 7UP brand website, http://www.7up.com (the

17   "7UP Website").

18        10.    Further, on the 7UP Website, Defendants display 7UP Cherry

19   Antioxidant surrounded by images of real cherries, along with the statements "There's

20   never been a more delicious way to cherry pick your antioxidant!" *See* graphic insert;

21   http://www.7up.com/products/#/Cherry (last visited Feb. 7, 2013).  Further, in the

22   recent past, the 7UP Website displayed animated images of falling cherries each time

23   a visitor highlighted an image of the 7UP Cherry Antioxidant soft drink. *See id.* (last

24   visited Feb. 7, 2013).

25

26

27

28



11.     The representation "Antioxidant," which is part of the name of each of the Products, is central to the marketing of the Products.  The images of real cherries, real berries, and real pomegranates – as well as the words "Cherry," "Mixed Berry," and "Pomegranate" – are also central to the marketing of the Products, and these images are displayed prominently in the Product marketing and are juxtaposed with the representation "Antioxidant."

12.     Contrary to Defendants' claims and representations, the Products do not contain any real cherries, real berries, real pomegranates, or even extracts from those fruits.  Nor do the Products derive their antioxidant content from real, antioxidant-rich cherries; real, antioxidant-rich raspberries, blackberries, or cranberries; or real, antioxidant-rich pomegranate.  Unbeknownst to the average consumer, the antioxidant the Products contain is added vitamin E – which is not from cherries, berries, or pomegranates.

13.     Further, as explained in detail below, the minimal amount of added vitamin E in the Products is insufficient to provide consumers with the health benefits that Defendants' representations lead them to believe the Products are able to confer.

FIRST AMENDED CLASS ACTION COMPLAINT

1    Defendants' representations are especially misleading in light of other ingredients in

2    the Products that are dangerous to consumers' health, such as high fructose corn syrup

3    in the non-"Diet" Products and the artificial sweeteners acesulfame potassium and

4    aspartame in the "Diet" Products.

5         14.    Accordingly, Defendants' use of the words "Cherry," "Mixed Berry,"

6    and "Pomegranate" immediately before the word 7UP, the labeling and naming of the

7    Products as "antioxidant"; Defendants' inclusion of images of real cherries, real

8    berries, or real pomegranates in the Products' marketing and advertising, often

9    juxtaposed with the term "antioxidant"; and the other representations detailed herein

10   are false, misleading, and designed to deceive consumers into purchasing Defendants'

11   Products, believing that they provide antioxidant health benefits found in cherries,

12   berries, and pomegranates, when they do not, and misleading and deceiving

13   consumers into believing that cherries, berries, and pomegranates are ingredients in

14   the Products (when, in fact, they are not).  Plaintiff brings this action to stop

15   Defendants' misleading practices.

16                        **JURISDICTION AND VENUE**

17        15.    This Court has original jurisdiction over this proposed class action

18   pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action

19   Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal

20   courts in any class action in which at least 100 members are in the proposed plaintiff

21   class, any member of the plaintiff class is a citizen of a State different from any

22   defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive

23   of interest and costs.  Plaintiff alleges that the total claims of individual members of

24   the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the

25   aggregate, exclusive of interest and costs.

26        16.    Venue for this action properly lies in this District pursuant to 28 U.S.C.

27   § 1391.  Substantial acts in furtherance of the alleged improper conduct, including

28

FIRST AMENDED CLASS ACTION COMPLAINT

1  Defendants' dissemination of false information regarding the nutritional qualities,

2  health qualities, and ingredients of the Products occurred within this District.

3  **PARTIES**

4  17.     Plaintiff David Green resides in Sherman Oaks, California, and has no

5  intention of changing his residence.  During the Class Period, Plaintiff Green bought

6  7UP brand Products bearing the "Antioxidant" representation on the Product

7  packaging and in the Product name.  Specifically, Plaintiff Green bought Cherry 7UP

8  Antioxidant in December of 2011 at a local Ralph's grocery store.  In deciding to

9  purchase the Product, Plaintiff Green relied upon the word Cherry in the name of the

10  Product "Cherry 7Up Antioxidant"; relied upon the images of cherries; and relied

11  upon the use of the word "Antioxidant" in the Product name to believe that the

12  Product was made from cherries and that the antioxidants, and the health benefits

13  associated with the antioxidants, came from real cherries used in the Product.  Had

14  Plaintiff known at the time he purchased the Products that they did not contain real

15  cherries; that their antioxidant content was not derived from real cherries, or even

16  extracts from cherries, but instead was based on Defendants' fortification of the

17  Products with an isolated antioxidant; and that the only antioxidant in the Products,

18  vitamin E, was only present in a minimal amount that was insufficient to provide

19  Plaintiff Green with any health benefits; Plaintiff Green would not have purchased the

20  Product.

21  18.     Defendant DPSU  (a.k.a. Dr Pepper/Seven Up, Inc.) has its principal

22  place of business located at 5301 Legacy Drive, Plano, Texas.  Defendant DPSU is a

23  wholly-owned subsidiary of Defendant DPSG.  Defendant DPSU markets and

24  distributes Cherry 7UP Antioxidant, Diet Cherry 7UP Antioxidant, Mixed Berry 7UP

25  Antioxidant, Diet Mixed Berry 7UP Antioxidant, Pomegranate 7UP Antioxidant, Diet

26  Pomegranate 7UP Antioxidant, and other similar products throughout California and

27  the nation.

28

7

FIRST AMENDED CLASS ACTION COMPLAINT

1      19.    Defendant DPSG (a/k/a Dr Pepper Snapple Group, Inc.) is a Delaware

2  corporation with its principal place of business at 5301 Legacy Drive Plano, Texas.

3  DPSG markets and distributes Cherry 7UP Antioxidant, Diet Cherry 7UP

4  Antioxidant, Mixed Berry 7UP Antioxidant, Diet Mixed Berry 7UP Antioxidant,

5  Pomegranate 7UP Antioxidant, Diet Pomegranate 7UP Antioxidant, and other similar

6  products throughout California and the nation.  As stated in Defendant DPSG's 10-K

7  filed with the Securities Exchange Commission regarding 7UP and other products:

8  "We use an on-going process of market and consumer analysis to identify key brands

9  that we believe have the greatest potential for profitable sales growth.  We intend to

10  continue to invest most heavily in our key brands to drive profitable and sustainable

11  growth by strengthening consumer awareness, developing innovative products and

12  extending brands to take advantage of evolving consumer trends, improving

13  distribution and increasing promotional effectiveness."

14      20.    DPSG lists 7UP as a brand of the company, and states that "[t]oday, 7UP

15  is part of Dr Pepper Snapple Group, an integrated refreshment beverage business

16  marketing more than 50 beverage brands throughout North America." *See* DPSG

17  website, www.drpeppersnapplegroup.com/brands/7up/.

18      21.    DPSG's website further states: "We manufacture, bottle, and distribute

19  Dr Pepper, 7UP, Mott's . . .."

20     22.  Based upon information and belief, both DPSG and DPSU are responsible for

21  the misleading labeling and marketing here.  Many of the persons involved in the

22  marketing and labeling of 7-Up for DPSU are also employees of DPSG, working for

23  DPSU and DPSG in the same capacity.  For example, Arthur Swanson is the Vice

24  President and Assistant General Counsel for both DPSU and DPSG.  Danh Loyd is the

25  packaging manager for the 7UP antioxidant Products at issue; Mr. Loyd is employed

26  by both DPSG and DPSU as a Packaging Manager.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

## **SUBSTANTIVE ALLEGATIONS**

23.    The use of the words "Cherry," "Mixed Berry," and "Pomegranate" immediately before the name "7UP" conveys to the consumer that cherries, berries, and pomegranates are ingredients in the Products.

24.    Additionally, Defendants use the word "antioxidant" to deceive and mislead consumers into believing that the Products contain cherries, berries, or pomegranates and that these fruits are the source of the antioxidants.

25.    Images of real cherries, berries, and pomegranates in the Products' labeling and advertising suggest to the average consumer that the Products contain real cherries, real berries (such as real raspberries, real blackberries, and real cranberries), and real pomegranates, or that the Products contain extracts from these fruits.

26.    Defendants' juxtaposition of the representation "Antioxidant" with the words "Cherry," "Mixed Berry," and "Pomegranate" suggests to the average consumer that any antioxidant content in the Products is derived from real cherries, berries (such as cranberries, blackberries, and raspberries), or pomegranates.

27.    Likewise, Defendants' juxtaposition of the representation "Antioxidant" with the images of real cherries, berries (cranberries, blackberries, and raspberries), or pomegranates suggests to the average consumer that any antioxidant content in the Products is derived from real cherries, berries, or pomegranates.

28.    Unfortunately for consumers, the Products do not contain any real cherries, real berries (cranberries, blackberries and raspberries), real pomegranates, or even extracts from those fruits.  Nor do the Products derive their antioxidant content from real, antioxidant-rich cherries; real, antioxidant-rich raspberries, blackberries, or cranberries; or real, antioxidant-rich pomegranates.  Instead, Defendants base their antioxidant representations solely on their fortification of the Products with a trace

FIRST AMENDED CLASS ACTION COMPLAINT

1   amount of a form of vitamin E called d-alpha tocopheryl acetate – the only antioxidant

2   in the Products.

3      29.   Moreover, the Products do not provide the health benefits that reasonable

4   consumers associate with antioxidants.

5      30.   Defendants' addition of vitamin E to the Products provides only 15% of

6   the Food and Drug Administration's ("FDA") Recommended Daily Intake ("RDI") of

7   vitamin E per 12 ounce can.  Current scientific research, however, does not indicate

8   that vitamin E provides significant health benefits at this level.

9      31.   For example, studies have found that vitamin E doses greater than 400

10   international units every other day are required to provide humans with health

11   benefits. *See* H.D. Sesso et al., *Vitamin E and C in the Prevention of Cardiovascular*

12   *Disease in Men*, 300 JAMA 2123, 2123 (2002) (finding that vitamin E doses greater

13   than 400 international units every other day are required to suppress elevated systemic

14   oxidative stress in humans); *see also* L. Jackson Roberts II et al., *The Relationship*

15   *Between Dose of Vitamin E and Suppression of Oxidative Stress in Humans*, 43 Free

16   Radic. Biol. Med. 1388, 1391-1392 (2007).  By comparison, the RDI established by

17   the FDA for vitamin E is 30 international units. *See* 21 C.F.R. § 101.9(c)(8)(iv).  At

18   10% RDI per serving, the Products contain less than 3 international units per serving –

19   only 0.75% of the amount of vitamin E that scientific research establishes is required

20   to provide humans with health benefits.

21      32.   Moreover, consumers seeking simply to meet the RDI for vitamin E are

22   also unlikely to experience health benefits from 7UP Antioxidant Products.  The

23   National Institutes of Health confirms that vitamin E deficiency is rare, and the

24   average American likely exceeds the RDI for vitamin E.  National Institutes of Health,

25   Office of Dietary Supplements, *Dietary Supplement Fact Sheet: Vitamin E*, *available*

26   *at* http://ods.od.nih.gov/factsheets/VitaminE-HealthProfessional/ (accessed Feb. 7,

27   2013).

28

FIRST AMENDED CLASS ACTION COMPLAINT

33. Further, scientific research suggests that isolated antioxidants, such as the vitamin E added to Defendants' Products, do not provide the same health benefits as a diet rich in fruits and vegetables.[1]  Clinical trials indicate that individual antioxidants, taken alone, do not appear to have consistent preventative effects. *See, e.g.*, Rui Hai Liu, *Health Benefits of Fruits and Vegetables are from Additive and Synergistic Combinations of Phytochemicals*, 78 Am. J. Clinical Nutrition 517S, 518S (2003); *see also* National Institutes of Health, Office of Dietary Supplements, *Dietary Supplement Fact Sheet: Vitamin E*, *available at* http://ods.od.nih.gov/factsheets/ VitaminE-HealthProfessional/ (accessed Feb. 7, 2013) (advising consumers to obtain antioxidants such as vitamin E through healthful foods such as almonds, peanut butter, broccoli, and spinach, rather than through supplements or fortified foods).

34. In this regard, the United States Department of Agriculture notes that

> [a] fundamental premise of the Dietary Guidelines [for Americans] is that
> nutrients should come primarily from foods.  Foods in nutrient-dense,

---

[1] Numerous studies establish that consuming whole fruits and vegetables benefits health and suggest that consumption of individual vitamins does not provide the same benefits. *See e.g.*, Penny M. Kris-Etherton et al., *Bioactive Compounds in Foods: Their Role in the Prevention of Cardiovascular Disease and Cancer*, 113 Am. J. Med. 71S, 71S–88S (2002) ("Numerous epidemiologic studies indicate that an increase in the consumption of fruits and vegetables is associated with a decrease in the incidence of cardiovascular disease (CVD), [coronary heart disease], and stroke."); Y. Kelly et al., *Nutrition and Respiratory Health in Adults: Findings from the Health Survey for Scotland*, 21 European Respiratory J. 664, 664–671 (2003) ("[T]he active agent(s), or the most beneficial combinations of dietary components are contained within whole foods. It may be that improving the diet, by increasing the consumption of fresh fruit, vegetables and fish, rather than consumption of vitamin supplements, will be beneficial in helping to protect against airway disease."); Manuela Blasa et al., *Fruit and Vegetable Antioxidants in Health, in Bioactive Foods Promoting Health: Fruits and Vegetables* 37, 37–58 (Ronald Ross Watson & Victor R. Preedy eds., 2010) ("The synergy among phytochemicals is one of the reasons that nutritional guidelines insist on varying the foods in one's diet, particularly fruits and vegetables.").

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3

mostly intact forms contain not only the essential vitamins and minerals that are often contained in nutrient supplements, but also dietary fiber and other naturally occurring substances that may have positive health effects.

4  United States Department of Agriculture, *Dietary Guidelines for Americans, 2010*,

5  Ch. 5 p. 49 (Jan. 31, 2011), *available at* http://www.cnpp.usda.gov/DGAs2010-

6  PolicyDocument.htm (click on "Chapter 5: Building Healthy Eating Patterns").

7  35.   Not only do the Products fail to provide any antioxidant health benefits

8  suggested by the representations in the Product marketing, the Products include

9  ingredients that are harmful or potentially harmful to human health.

10  36.   The non-"Diet" Products are in fact nothing more than slightly fortified

11  sugar water.  One serving of 7UP Cherry Antioxidant, for example, contains 38 grams

12  of sugars and 140 calories.  The non-"Diet" Products also include high fructose corn

13  syrup, an artificial ingredient that scientific research has established is dangerous to

14  human health. *See, e.g.*, George A. Bray et al., *Consumption of High-Fructose Corn*

15  *Syrup in Beverages May Play a Role in the Epidemic of Obesity*, 79(4) Am. J. Clinical

16  Nutrition 537, 537–43 (2004).

17  37.   While the "Diet" Products do not contain added sugars or high fructose

18  corn syrup, they do contain the artificial sweeteners acesulfame potassium and

19  aspartame, both of which are synthetic.  There is some scientific evidence that these

20  artificial sweeteners are carcinogenic to animals,[2] and that they increase the risk of

21  preterm birth in humans.[3]

22

23  [2] *See* Myra L. Karstadt, *Testing Needed for Acesulfame Potassium, an Artificial*

24  *Sweetener*, 114 Environ. Health Perspectives A516 (Sept. 2006); Morando Soffritti,
*Acesulfame Potassium: Soffritti Responds*, 114 Environ. Health Perspectives A516

25  (Sept. 2006); Morando Soffritti et al., *Life-Span Exposure to Low Doses of Aspartame*
*Beginning During Prenatal Life Increases Cancer Effects in Rats*, 115 Environ.

26  Health Perspectives 1293 (2007), *available at*

27   http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1964906/; Morando Soffritti et al.,

28

12
FIRST AMENDED CLASS ACTION COMPLAINT

38.     The Products also include an ingredient called Red 40, which may also impose health risks. *See* Shuji Tsuda et al., *DNA damage Induced By Red Food Dyes Orally Administered to Pregnant and Male Mice*, 61(1) Toxicological Sci. 92, 92–99 (2001), *available at* http://www.ncbi.nlm.nih.gov/pubmed/11294979?dopt=Abstract; Charles V. Vorhees et al., *Developmental Toxicity and Psychotoxicity of FD and C Red Dye No. 40 (Allura Red AC) in Rats*, 28(3) Toxicology 207, 207–17 (Oct. 1983), *available at* http://www.ncbi.nlm.nih.gov/pubmed/6636206?dopt=Abstract; L. Koutsogeorgopoulou et al., *Immumological Aspects of the Common Food Colorants, Amaranth and Tartrazine*, 40(1) Veterinary & Hum. Toxicology 1, 1–4 (Feb. 1998), *available at* http://www.ncbi.nlm.nih.gov/pubmed/9467198?dopt=Abstract.

39.     In summary, Defendants' representations, including the representation "Antioxidant" juxtaposed with the words "Cherry 7UP"; "Mixed Berry 7UP"; and "Pomegranate 7UP"; and the use of images of real cherries, berries (cranberries, blackberries and raspberries), and pomegranates mislead reasonable consumers into believing that the Products contain real cherries, real berries, or real pomegranates and/or into believing that the antioxidant content of the Products is derived from real cherries, real berries, or real pomegranates, or extracts from these fruits, even though the Products do not contain real cherries, berries, or pomegranates or extracts from those fruits, and the only antioxidant in the Products – vitamin E – is only present in the Products due to fortification by Defendants.  By using the term "Antioxidant" in

---

*First Experimental Demonstration of the Multipotential Carcinogenic Effects of Aspartame Administered in the Feed to Sprague-Dawley Rats*, 114 Environ. Health Perspectives 379 (2006).

[3] Thorhallur I. Halldorsson et al., *Intake of Artificially Sweetened Soft Drinks and Risk of Preterm Delivery: A Prospective Cohort Study in 59,334 Danish Pregnant Women*, 92 Am. J. Clin. Nutr. 626 (2010).

FIRST AMENDED CLASS ACTION COMPLAINT

the manner they do, Defendants are representing that the antioxidant – and thereby the Products – may be useful in maintaining healthy dietary practices for consumers. Defendants thus mislead reasonable consumers into believing that the Products provide antioxidant-related health benefits that are the same as or similar to the antioxidant-related health benefits provided by fruits and vegetables naturally rich in many nutrients and phytonutrients, only one of which is vitamin E. The minimal amount of vitamin E in the Products and the fact that vitamin E exists in the Products in isolation as an additive mean that the Products will not provide consumers with the health benefits that Defendants' representations lead them to expect. Even worse, the high sugar content, high fructose corn syrup, aspartame, acesulfame potassium, and/or Red 40 found in the Products are actually dangerous to consumers' health. Defendants' use of the term "Antioxidant" and the other representations and images detailed herein in the marketing of the Products is thus nothing more than a marketing gimmick intended to deceive consumers into purchasing the Products. Accordingly, Defendant's representations concerning the nutritional qualities, health qualities, and ingredients of the Products are misleading, deceptive, and unlawful.

40. Moreover, Defendants' fortification of the Products with chemical additives is in direct violation of the FDA's Fortification Policy. 21 C.F.R. § 104.20 (the "Fortification Policy"). The Fortification Policy states specifically that the FDA "does not encourage indiscriminate addition of nutrients to foods, *nor does it consider it appropriate to fortify … snack foods such as … carbonated beverages*." *See* 21 C.F.R. § 104.20(a) (emphasis added). Because Defendants fortify the Products, which are all carbonated beverages, with vitamin E, Defendants have engaged in actions that the FDA does not consider appropriate, as the Fortification Policy explicitly states.

41. Defendants rely on this inappropriate fortification to make antioxidant claims so that they may mislead consumers into believing the Products may be useful in maintaining healthy dietary practices. Defendants successfully reinforce this

representation that the Products are healthy by juxtaposing the antioxidant claim with pictures of real fruit and the words "Cherry," "Mixed Berry," and "Pomegranate" – fruit well known for their antioxidant content.

42.     According to the FDA, the Fortification Policy has the full force and effect of law. *See* Food and Drug Administration, *Guidance for Industry: Food Labeling; Nutrient Content Claims; Definition for "High Potency" and Definition for "Antioxidant" for Use in Nutrient Content Claims for Dietary Supplements and Conventional Foods; Small Entity Compliance Guide*, 3 (June 1, 2011), *available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocu ments/FoodLabelingNutrition/ucm063064.htm; *see also* Letter from Food and Drug Administration, to Miles V. McEvoy, Deputy Administrator, National Organic Program (Apr. 14, 2011), at 4, *available at* http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5090415 (stating that since "the provisions of the fortification policy have been incorporated into two labeling regulations which have the force and effect of law . . . FDA may issue a warning letter and take enforcement action if a manufacturer markets a food bearing one of these nutrient content claims and the food contains a nutrient addition that is inconsistent with the fortification policy.").

43.     The federal courts have also recognized that the Fortification Policy has legally binding effect.  For example, the United States District Court for the Eastern District of New York explained in 2010 that "[t]he FDA Fortification Policy is itself non-binding but … is incorporated by reference into binding FDA regulations.  As the FDA has explained:

> While it is true that the fortification policy is only a guideline, in the context of new § 101.54(e)(1)(ii), FDA has subjected the use of § 104.20 (21 C.F.R. 104.20) to notice and comment rulemaking.  Interested persons were given notice that FDA intends to use that provision as more than a guideline.  Such persons had an opportunity to object....  No comments did.  Therefore, the fact that part 104 (21 CFR part 104) is

FIRST AMENDED CLASS ACTION COMPLAINT

1   generally intended to be used as a guideline has no significance here.

2   *Ackerman v. Coca-Cola Co.*, Case No. CV–09–0395 (JG)(RML), 2010 WL 2925955,

3   at *9, n.16 (E.D.N.Y. July 21, 2010) (citing 58 Fed. Reg. 2302, 2362).

4      44.    Defendants add the nutrient vitamin E to their Products in order to

5   suggest that the Products may help consumers maintain healthy dietary practices (*see,*

6   *e.g.*, Defendants' advertisement quoted above: "There's never been a more delicious

7   way to cherry pick your antioxidant!").  Thus, Defendants' fortification of these soft

8   drinks with vitamin E are not "in accordance with the fortification policy for foods in

9   section 104.20 of this chapter." 21 C.F.R. § 101.65(d).

10      45.    The FDA has issued several warning letters to companies, including

11   Defendants and The Coca-Cola Company, for similar violations of its Fortification

12   Policy. *See, e.g.*, Letter from Food and Drug Administration to Larry D. Young,

13   President and CEO, Dr Pepper Snapple Group (Aug. 30, 2010), *available at*

14   http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm224571.htm;

15   Letter from Food and Drug Administration to Muhtar Kent, President and Chief

16   Executive Officer, The Coca-Coca Company (Dec. 10, 2008), *available at*

17   http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2008/ucm1048050.ht

18   m; *see generally Diet Coke Plus Proves to Be a Minus With the FDA,* 16 No. 12 FDA

19   Advertising and Promotion Manual Newsletter 11 (2009).

20      46.    Accordingly, Defendants' fortification of the Products with vitamin E,

21   and representations that due to this fortification the Products (which are all

22   carbonated) may help consumers maintain health dietary practices, violate the FDA

23   Fortification Policy, which has the full force and effect of law and which the FDA

24   routinely enforces.  In addition to violating the FDA's Fortification Policy,

25   Defendants' conduct violates regulations for implied nutrient content claims.  By

26   violating these regulations, Defendants are able to mislead consumers into believing

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

1 that these sugary, unhealthful Products may provide health benefits associated with

2 antioxidants and will help consumers maintain a healthy diet.

3 <u>**CLASS ALLEGATIONS**</u>

4      47.    Plaintiff brings this action as a class action pursuant to Rule 23 of the

5 Federal Rules of Civil Procedure on behalf of all persons in the United States who

6 purchased Defendant's Products (as defined herein) during the Class Period (the

7 "Class"). Excluded from the Class are officers and directors of Defendant, members

8 of the immediate families of the officers and directors of Defendant, Defendant's legal

9 representatives, heirs, successors, or assigns, and any entity in which they have or

10 have had a controlling interest.

11      48.    At this time, Plaintiff does not know the exact number of Class members,

12 but, given the nature of the claims and the number of retail stores selling Defendant's

13 Products nationally, Plaintiff believes that the Class members are so numerous that

14 joinder of all members of the Class is impracticable.

15      49.    There is a well-defined community of interest in the questions of law and

16 fact involved in this case. Questions of law and fact common to the members of the

17 Class which predominate over questions which may affect individual Class members

18 include:

19         a.  Whether Defendants labeled, marketed, advertised, and/or sold the

20             Products to Plaintiff and those similarly situated using false,

21             misleading, and/or deceptive statements or representations,

22             including statements or representations concerning the nutritional

23             qualities, health qualities, and ingredients of the Products;

24         b.  Whether Defendants omitted and/or misrepresented material facts in

25             connection with the sales of the Products;

26         c.  Whether Defendants participated in and pursued the common course

27             of conduct complained of herein; and

28

FIRST AMENDED CLASS ACTION COMPLAINT

d.  Whether Defendants' labeling, marketing, advertising, and/or selling of the Products as healthful and nutritious constitutes an unfair or deceptive consumer sales practice.

50.   Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased Defendants' Products in a typical consumer setting and sustained damages from Defendants' wrongful conduct.

51.   Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in litigating complex class actions.  Plaintiff has no interests that conflict with those of the Class.

52.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

53.   The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Federal Rule of Civil Procedure 23(b)(2) are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

54.   The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Class even though certain Class members might not be parties to such actions.

55.   Defendants' conduct is generally applicable to the Class as a whole, and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendants' systematic policies and practices make declaratory relief with respect to the Class as a whole appropriate.

FIRST AMENDED CLASS ACTION COMPLAINT

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of the Consumers Legal Remedies Act,
### California Civil Code § 1750 *et seq.*)

56.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

57.     This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750 *et seq.* (the "CLRA").

58.     Plaintiff and members of the Class are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the Products for personal, family, or household purposes.

59.     Plaintiff, members of the Class, and Defendants have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

60.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purposes of the CLRA, and the conduct was undertaken by Defendants in transactions intended to result in, and which did result in, the sale of goods to consumers.

61.     As alleged more fully above, Defendants have violated the CLRA by falsely representing to Plaintiff and the Class members certain qualities of its Products.

62.     As a result of engaging in such conduct, Defendants have violated California Civil Code § 1770(a)(5), (a)(7), and (a)(9).

63.     Pursuant to California Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order of this Court that includes, but is not limited to, an order requiring Defendants to remove language and images on the Product packaging and in Product advertising and marketing that indicates that the Products provide the health benefits associated with antioxidants contained in real cherries or real berries, including but

1   not limited to the representation "Antioxidant" in the name of each Product and

2   images of real cherries, real berries, or real pomegranate on the Product packaging.

3       64.     Plaintiff and members of the Class may be irreparably harmed and/or

4   denied an effective and complete remedy if such an order is not granted.

5       65.     The unfair and deceptive acts and practices of Defendants, as described

6   above, present a serious threat to Plaintiff and members of the Class.

7       66.     CLRA § 1782 NOTICE.  On September 6, 2012, a CLRA demand letter

8   was sent to Defendant DPSG via certified mail that provided notice of Defendant

9   DPSG's violation of the CLRA and demanded that within thirty (30) days from that

10  date, Defendant DPSG remedy the unlawful, unfair, false, and/or deceptive practices

11  complained of herein. The letter also stated that if Defendant DPSG refused to do so, a

12  complaint seeking damages in accordance with the CLRA would be filed.  Defendant

13  DPSG has failed to comply with the letter.  Accordingly, pursuant to California Civil

14  Code § 1780(a)(3), Plaintiff, on behalf of himself and all other members of the Class,

15  seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains

16  due to Defendant's acts and practices.  On January 18, 2013, a CLRA demand letter

17  was sent to Defendant DPSU that provided the same notice received by Defendant

18  DSPG described above.  On January 29, 2013, Defendant DPSU agreed to waive the

19  30 day pre-suit notice period, allowing for Plaintiff to file a claim for damages under

20  the CLRA against DPSU in this amended complaint.

21      67.     THEREFORE, Plaintiff prays for relief as set forth below.

22              **SECOND CAUSE OF ACTION**

23      **(Violation of California Business and Professions Code § 17200 *et seq.*)**
        **(Unlawful Business Acts and Practices)**
24

25      68.     Plaintiff repeats each and every allegation contained in the paragraphs

26  above and incorporates such allegations by reference herein.

27

28

1     69.     Such acts of Defendants, as described above, and each of them

2     constitute unlawful business acts and practices.

3     70.     In this regard, Defendants' marketing, advertising, packaging, labeling,

4     distributing, and selling of its Products violates California's Sherman Food, Drug and

5     Cosmetics Law, California Health & Safety Code § 109875 *et seq.* (the "Sherman

6     Law").

7     71.     In relevant part, the Sherman Law declares that food is misbranded if

8     its labeling is false or misleading in any particular way and further provides that it is

9     unlawful for any person to misbrand any food. Cal. Health & Safety Code §§ 110660,

10    110765.

11    72.     The Sherman Law defines a "person" as "any individual, firm,

12    partnership, trust, corporation, limited liability company, company, estate, public or

13    private institution, association, organization, group, city, county, city and county,

14    political subdivision of this state, other governmental agency within the state, and any

15    representative, agent, or agency of any of the foregoing." Cal. Health & Safety Code

16    § 109995.  Defendants are corporations and, therefore, a "person" within the meaning

17    of the Sherman Law.

18    73.     In addition, Defendants' practices violate the FDA's Fortification Policy.

19    74.     The business practices alleged above are unlawful under the

20    California Consumers Legal Remedy Act, California Civil Code § 1750 *et seq.*

21    ("CLRA"), which forbids deceptive advertising.

22    75.     The business practices alleged above are unlawful under California

23    Business and Professions Code § 17200 *et seq.* by virtue of violating § 17500 *et seq.*,

24    which forbids untrue advertising and misleading advertising.

25    76.     As a result of the business practices described above, Plaintiff and the

26    Class members, pursuant to California Business and Professions Code § 17203, are

27    entitled to an order enjoining such future conduct on the part of Defendants and such

28

1  other orders and judgments which may be necessary to disgorge Defendants' ill-gotten

2  gains and to restore to any person in interest any money paid for its Products as a

3  result of the wrongful conduct of Defendants.

4      77.   The above-described unlawful business acts and practices of

5  Defendants present a threat and reasonable likelihood of deception to Plaintiff and

6  members of the Class in that Defendants have systematically perpetrated and

7  continues to perpetrate such acts or practices upon members of the Class by means of

8  its misleading marketing, advertising, packaging, labeling, distributing, and selling of

9  its Products.

10     78.   THEREFORE, Plaintiff prays for relief as set forth below.

11  ### THIRD CAUSE OF ACTION

12  **(Violation of California Business and Professions Code, § 17500 *et seq.*)**
    **(Misleading and Deceptive Advertising)**

13

14     79.   Plaintiff repeats each and every allegation contained in the paragraphs

15  above and incorporates such allegations by reference herein.

16     80.   Plaintiff asserts this cause of action for violations of California Business

17  and Professions Code § 17500 *et seq.* for misleading and deceptive advertising

18  against Defendants.

19     81.   At all material times, Defendants engaged in a scheme of offering its

20  Products for sale to Plaintiff and other members of the Class by way of, *inter alia*,

21  commercial marketing and advertising, the World Wide Web (Internet), product

22  packaging, and other promotional materials. Defendants' portrayal of its Products as

23  being made from real cherries, real berries, or real pomegranate and as being healthful

24  and rich in antioxidants is misleading and deceptive because among other things more

25  full described herein, the Products will not help consumers maintain healthy dietary

26  practices, and the Products contain only minimal amounts of a single, isolated

27  antioxidant that is present in the Products due to fortification by Defendants and

28

FIRST AMENDED CLASS ACTION COMPLAINT

1   contain no real fruit. Said advertisements were made within the State of California and

2   come within the definition of advertising as contained in Business and Professions

3   Code § 17500 *et seq.* in that such promotional materials were intended as inducements

4   to purchase Defendants' Products, are representations disseminated by Defendants to

5   Plaintiff and the Class members, and were intended to reach members of the Class.

6   Defendants knew, or in the exercise of reasonable care should have known, that these

7   statements were misleading and deceptive.

8       82.    In furtherance of said plan and scheme, Defendants have prepared

9   and distributed within the State of California – via commercial marketing and

10  advertising, the World Wide Web (Internet), product packaging, and other

11  promotional materials – representations that misleadingly and deceptively represent

12  the Products as being made from real cherries, real berries, or real pomegranates and

13  as being healthful and nutritious and helping to maintain healthy dietary practices.

14  Consumers, including Plaintiff, necessarily and reasonably relied on these materials

15  concerning Defendants' Products.  Consumers, including Plaintiff and the other Class

16  members, were among the intended targets of such representations.

17      83.    The above acts of Defendants, in disseminating said misleading and

18  deceptive representations throughout the State of California to consumers, including

19  Plaintiff and the other members of the Class, were and are likely to deceive reasonable

20  consumers, including Plaintiff and the other members of the Class, by obfuscating the

21  real health qualities, nutritional qualities, and ingredients of the Products as more fully

22  detailed herein, in violation of the "misleading prong" of California Business and

23  Professions Code § 17500.

24      84.    As a result of the above violations of the "misleading prong" of

25  California Business and Professions Code § 17500 *et seq.*, Defendants have been

26  unjustly enriched at the expense of Plaintiff and the other members of the Class.

27  Plaintiff and the other Class members, pursuant to California Business and

28

Professions Code § 17535, are entitled to an order of this Court enjoining such future conduct on the part of Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore to any person in interest any money paid for its Products as a result of the wrongful conduct of Defendants.

85.    THEREFORE, Plaintiff prays for relief as set forth below.

### FOURTH CAUSE OF ACTION

#### (Unjust Enrichment)

86.    Plaintiff realleges and incorporates the above paragraphs of this class action Complaint as if set forth herein.

87.    As a result of Defendants' deceptive marketing and sales of its Products, Defendants were enriched, at the expense of Plaintiff, and all others similarly situated, through the payment of the purchase price for Defendants' Products.

88.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiff and the other members of the Class in light of the fact that the Products purchased by Plaintiff and the other members of the Class were not what Defendants purported them to be. Thus, it would be unjust or inequitable for Defendants to retain the benefit without restitution to Plaintiff and the other members of the Class for the monies paid to Defendants for such Products.

89.    THEREFORE, Plaintiff prays for relief as set forth below.

### PRAYER FOR RELIEF

**THEREFORE**, Plaintiff and the other Class members seek relief against Defendants, including:

A.    An order certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3); appointing Plaintiff as representatives of the Class; and appointing his undersigned counsel as Class counsel;

1        B.      A declaration that Defendants are financially responsible for notifying

2   Class members of the pendency of this suit;

3        C.      An award of restitution pursuant to California Business & Professional

4   Code §§ 17203 and 17535;

5        D.      An award of disgorgement pursuant to California Business &

6   Professional Code §§ 17203 and 17535;

7        E.      An order enjoining Defendants' unlawful and deceptive acts and

8   practices pursuant to California Business & Professional Code §§ 17203 and 17535.

9        F.      Injunctive relief, damages, and restitution pursuant to California Civil

10  Code § 1780;

11       G.     Monetary damages, including, but not limited to any compensatory,

12  incidental, or consequential damages in an amount to be determined at trial, together

13  with prejudgment interest at the maximum rate allowable by law with respect to the

14  common law claims alleged;

15       H.     Statutory damages in the maximum amount provided by law;

16       I.      Punitive damages in accordance with proof and in an amount consistent

17  with applicable precedent;

18       J.      An order awarding Plaintiff and the Class members the reasonable costs

19  and expenses of suit, including their attorneys' fees; and

20       K.     Any further relief that the Court may deem appropriate.

21                   **<u>JURY TRIAL DEMANDED</u>**

22       Plaintiff and the members of the Class hereby demand a trial by jury.

23  Dated: February 11, 2013          Respectfully submitted,

24                        **REESE RICHMAN LLP**

25                        **By:** _____

26                        Michael R. Reese (State Bar No. 206773)

27                        875 Avenue of the Americas, 18th Floor

                             New York, New York 10001

28                        Telephone:  (212) 643-0500

FIRST AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Facsimile:  (212) 253-4272
Email:      mreese@reeserichman.com

**CENTER FOR SCIENCE IN THE PUBLIC INTEREST**
Stephen Gardner
Amanda Howell
5646 Milton Street, Suite 211
Dallas, Texas 75206
Telephone:  (214) 827-2774
Facsimile:  (214) 827-2787
Email:      SGardner@cspinet.org
            AHowell@cspinet.org

*Attorneys for Plaintiff and the Proposed Class*

FIRST AMENDED CLASS ACTION COMPLAINT